Deanna L. FREITAG, Plaintiff–
Appellee,

v.

Robert J. AYERS, Jr.; Teresa Schwartz;
Augustine Lopez; California Depart-
ment of Corrections and Rehabilita-
tion, Defendants–Appellants,

and

David A. Carmichael; G. Rodman;
Paul Dillard; Barry O'Neill;
George Neotti, Defendants.

Deanna L. Freitag, Plaintiff–Appellee,

v.

Robert J. Ayers, Jr.; Teresa Schwartz;
Augustine Lopez; California Depart-
ment of Corrections and Rehabilita-
tion, Defendants–Appellants,

and

David A. Carmichael; G. Rodman;
Paul Dillard; Barry O'Neill;
George Neotti, Defendants.

Deanna L. Freitag, Plaintiff–Appellee,

v.

Robert J. Ayers, Jr.; Teresa Schwartz;
Augustine Lopez; California Depart-
ment of Corrections and Rehabilita-
tion, Defendants–Appellants,

and

David A. Carmichael; G. Rodman;
Paul Dillard; Barry O'Neill;
George Neotti, Defendants.

Nos. 03–16702, 03–17184, 03–17398.

United States Court of Appeals,
Ninth Circuit.

Argued March 15, 2006.

Filed Sept. 13, 2006.

Amended Nov. 3, 2006.

Jacob A. Appelsmith, Senior Assistant Attorney General, Vincent J. Scally, Supervising Deputy Attorney General, and Bill Lockyer, Attorney General, Sacramento, CA, for the defendants-appellants.

Pamela Y. Price and John L. Burris, Oakland, CA, and Charles Stephen Ralston, Berkeley, CA, for the plaintiff-appellee.

Before STEPHEN REINHARDT, JOHN T. NOONAN, and MICHAEL DALY HAWKINS, Circuit Judges.

### ORDER AMENDING OPINION AND AMENDED OPINION

REINHARDT, Circuit Judge.

### ORDER

The opinion filed September 13, 2006, slip op. 11183, and appearing at 463 F.3d 838 (9th Cir.2006), is hereby amended as follows:

1. At slip op. at 11205, line 4: insert "sufficiently" after "failed to invoke".

2. At slip op. at 11205, line 4: after the sentence ending with "in this case." in-

sert the following footnote: The jury had before it evidence offered by the defendants regarding disciplinary measures taken, including a belated referral for criminal prosecution of a principal offender after Freitag had filed her formal complaint with the California Department of Fair Employment and Housing, and after she had sent two letters to State Senator Polanco that precipitated the investigation by the Inspector General. The belated referral, however, attempted to address the conduct of only one of the 20 inmates who were responsible for 56 incidents of exhibitionist masturbation in the security housing unit, as identified in the Inspector General's report. Moreover, the jury heard the Inspector General's findings that the "institution has stopped referring exhibitionist masturbation cases to the district attorney" and that "[c]ases that would be appropriate for prosecution are not referred."

3. At slip op. at 11208, line 2: after "Polanco," strike the rest of the sentence from line 2 to line 5, beginning with "and Schwartz temporarily" and ending with "complaints of inmate harassment." After "Polanco," on line 2, insert the following: "and Schwartz requested at least one IA investigation in the months after Freitag's complaints of sexual harassment."

With these amendments, the panel has voted to deny the petitions for panel rehearing and rehearing en banc. The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on it. The petitions for rehearing and rehearing en banc are DENIED. No further petitions for rehearing or rehearing en banc may be filed.

## OPINION

May a state department of corrections be held liable for prison officials' failure to correct a hostile work environment that is the result of male prisoners' sexual harassment of female guards? We answer that question, "Yes."

The California Department of Corrections and Rehabilitation (CDCR) and three Pelican Bay State Prison (Pelican Bay) administrators appeal a judgment in favor of Deanna Freitag, a former correctional officer in the prison's Secure Housing Unit. Freitag alleged that the CDCR and Pelican Bay were delinquent in addressing the sexually hostile environment created by prison inmates—particularly in confronting the pervasive practice at Pelican Bay of inmate exhibitionist masturbation directed at female officers—and that she was retaliated against and ultimately terminated due to her repeated complaints regarding the problem. A jury agreed, finding that the CDCR maintained a hostile work environment and retaliated against Freitag in violation of Title VII of the Civil Rights Act of 1964, and that the three administrators retaliated against her for engaging in constitutionally protected speech in violation of 42 U.S.C. § 1983. We conclude that substantial evidence supports the jury's verdict that the CDCR violated Freitag's rights under Title VII, but we remand her First Amendment claim to the district court for reconsideration in light of the Supreme Court's decision in *Garcetti v. Ceballos*, — U.S. —, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). As a result, we also remand the jury's damages award to the same extent. We affirm the district court's grant of injunctive relief, however.

I

In January 1996, Deanna Freitag transferred to Pelican Bay State Prison from

Chuckwalla Valley State Prison, where she had been a correctional officer for several years, in order to be closer to her family. Pelican Bay, a maximum security prison in Crescent City, California, includes a Secure Housing Unit (SHU) which incarcerates many of the state's most violent criminals. Inmates in the SHU are subjected to harsher and more restrictive conditions than exist at any other prison in the state system.[1]

On September 12, 1998, Freitag was working a relief shift in the SHU control tower when she witnessed Inmate X standing naked in the exercise yard masturbating. Freitag opened a prison pod door and directed Inmate X, over an intercom, to return to his cell, at which point he ripped a temperature gauge off the pod wall, screamed sexually derogatory obscenities, and threatened to kill her. Freitag was instructed by her direct supervisor not to document the incident, but she nevertheless completed a disciplinary report, or 115 Form, charging Inmate X with threatening a public official. Freitag reported several additional incidents of inmate exhibitionist masturbation in late 1998 in documents called "chronos," or 128 Forms, which are placed in inmates' central files but ordinarily do not form the basis for disciplinary action. In one instance, Freitag was working a meal shift in the SHU when an inmate ejaculated onto a tray she was clearing.

In early January 1999, Freitag accepted a permanent position in the SHU. Shortly thereafter, on January 6, she was in the SHU control tower when she witnessed Inmate Y openly masturbating in the prison yard. Freitag demanded that Inmate Y stop, but he refused; he continued to masturbate in view of the control tower for approximately thirty minutes until his yard shift ended. Freitag documented the incident in a 128 Form. On February 17, 1999, Inmate Z exited the upper tier shower room and, while looking at Freitag in the control tower, into which he had a direct view from the tier, masturbated while shouting her name and proclaiming that he was "coming inside" her. Freitag completed a 128 Form detailing the incident and attempted to discipline Inmate Z with ten days of escort status, which was approved by a supervising captain. However, Lieutenant David Carmichael discarded the 128 Form and informed Freitag that she could not place Inmate Z on escort status, explaining to her that she was the only officer who had a problem with Inmate Z, and that "it's only sex."

On March 17, Inmate X again openly masturbated in the SHU yard while Freitag was on duty in the control tower. She submitted a 115 Form charging Inmate X with indecent exposure, to which he pled guilty, but he was not assessed good-time credit forfeiture as a result of the disciplinary proceeding because prison administrators delayed in processing the paperwork. Also on March 17, Freitag sent a memorandum to Barry O'Neill, Carmichael's supervisor, with a copy to Robert Ayers, the warden at Pelican Bay, complaining that her reports of inmate misbehavior were being "denied or thrown away," thus causing her "authority and discretion [to be] undermined." On March 18, she issued Inmate X another 115 Form for indecent exposure.

On April 7, 1999, Inmate X requested that Freitag open the shower door to allow him to return to his cell. When she did so, he pushed his towel into the doorway and, standing naked, masturbated in front of her until she and another correctional officer escorted him back to his cell. Freitag submitted a 115 Form charging In-

---

1. The material facts in this case are not in dispute.

mate X with indecent exposure, but the violation was subsequently changed by a supervisor to willful delay of a peace officer, a lower-level offense. Later that day, Freitag sent a letter to Teresa Schwartz, the associate warden in charge of the SHU, chronicling the conduct of Inmates X and Z, complaining that her supervisors were "procrastinating" in responding to the sexually abusive behavior, and recommending enforcement of the CDCR's policy of referring repeat offenders to the district attorney's office for prosecution. She also stated: "For the supervisors' calloused exchange of me, and other female staff, as a sexual favor to gain [Inmate X's] cooperation, I should be recompensed for my injury."

On April 15, 1999, Freitag wrote a letter to Cal Terhune, the CDCR's director, in which she alleged that Inmate X was "causing a hostile worksite," that her "[s]upervisors have delayed responding and been reluctant to respond," and that "[t]here has been no support to prosecute[Inmate X] for his sexual attacks and harassment." Several days later, on April 23, Freitag was called to a meeting with Schwartz and O'Neill. At the meeting, Schwartz informed Freitag that she was being relieved of her duty in the SHU pending a psychiatric evaluation; Schwartz stated that the prison was taking the action in response to Freitag's "incoherent" memoranda regarding inmate harassment. Schwartz also threatened to terminate her. Freitag was permitted to return to the SHU only after the evaluation deemed her fit for duty.

On July 7, the day after Freitag returned to the SHU, she witnessed Inmate Y masturbating in the yard. She submitted a 115 Form charging him with indecent exposure, but her supervisors declined her recommendation that he be disciplined with escort status. On July 15, Freitag wrote another memorandum to Ayers requesting that officers in the SHU receive additional training on how to manage inmates with behavioral problems. She detailed an incident that occurred the day before in which Inmate Y refused to be handcuffed by two correctional officers, one of whom allegedly responded by slamming the cuff port door on the prisoner's hands.

On July 26, Pelican Bay initiated an internal affairs (IA) investigation of Freitag. The investigation was initiated by Ayers and arose from purported factual inaccuracies in Freitag's memorandum regarding the July 14 incident involving Inmate Y. On August 6, Ayers initiated another IA investigation of Freitag's allegations that her supervisors were destroying her disciplinary reports. The request submitted by Ayers alleged that Freitag had made "slanderous accusations against other staff."

On August 11, 1999, Freitag filed a formal complaint with the California Department of Fair Employment and Housing (DFEH). She alleged that she had been sexually harassed by Pelican Bay inmates, that she complained about the harassment to supervisors Glen Rodman, Carmichael, Schwartz, Ayers, and Terhune, that "my employer did not take the proper steps to address my complaint," and that in retaliation for her complaints she was threatened by Schwartz with termination and temporarily relieved of duty in the SHU. Augustine Lopez, the prison's Equal Employment Opportunity Coordinator, prepared the institution's response, which concluded that Freitag's allegations were unsubstantiated. As part of his investigation, Lopez interviewed Ayers and several other Pelican Bay administrators, but he acknowledges that he later destroyed the notes from those interviews.

On August 17, 1999, Freitag sent a letter to California State Senator Richard Polanco in which she alleged that she and other female correctional officers were regularly subjected to sexually abusive behavior in the SHU and that supervisors failed to respond adequately to her complaints regarding the inmate conduct. She also claimed that her disciplinary reports either were ignored completely or were not acted upon in sufficient time to permit the disciplining of inmates. She sent a second letter to Polanco dated September 24, 1999, with a copy to Terhune, in which she further described the mistreatment that she received from Pelican Bay inmates and staff. In October, Polanco contacted the California Office of the Inspector General (IG), a state agency that oversees the CDCR, and requested that it initiate an investigation of the allegations in Freitag's letters. The IG sent several investigators, including Senior Deputy Inspector General Richard Ramsdell, to Pelican Bay; from November to December 1999, they interviewed dozens of prison inmates and employees, including Freitag, reviewed the inmates' central files, and contacted the Del Norte County District Attorney's Office regarding the referral of indecent exposure complaints from the prison. Freitag also exchanged letters with Ramsdell during the investigation.

The IG published a report of its investigation on July 11, 2000. The findings were uniformly and pointedly damning: The agency determined that (1) inmates in the SHU "regularly subject female correctional officers to lewd exhibitionism and exhibitionist masturbation"; (2) "supervisors and top administrative staff at Pelican Bay have not responded appropriately to complaints about inmates directing exhibitionist masturbation toward female staff members and have made little effort to take advantage of the options available to

control exhibitionist masturbation behavior"; (3) "the security housing unit is not effectively using the prison disciplinary process and available legal sanctions in handling exhibitionist masturbation cases"; (4) Pelican Bay had "stopped referring exhibitionist masturbation cases to the district attorney"; and (5) Warden Ayers had taken "no definitive actions ... to address exhibitionist masturbation directed at female correctional officers by male inmates." The IG also reported that Lopez informed one state investigator that "[t]he reason the inmates hit on [the female correctional officers] is that they're a bunch of lesbians."

In addition to the two IA investigations of her initiated by Ayers in July and August 1999, Freitag was targeted by at least two more investigations following her DFEH complaint and letters to Polanco. On September 15, 1999, Ayers requested an IA investigation regarding Freitag's purported improper use of state resources, such as copy machines and telephones, for the purpose of pursuing her complaints. On October 22, Correctional Captain Paul Dillard sent Ayers a memorandum recommending that IA investigate allegedly false claims by Freitag that a correctional officer contaminated an inmate's food in May of that year. Freitag was formally interviewed regarding the latter charge on November 19, 1999.

On January 13, 2000, while the IG's investigation was being conducted, Schwartz sent Freitag a preliminary notice of adverse action stemming from the IA investigation into Freitag's report of the July 14, 1999, incident involving Inmate Y. Ayers recommended that Freitag be suspended for five days as a result of the investigation's determination that she falsified facts in her written memorandum describing the incident. On February 8, while the agency investigation was still in

progress, Schwartz sent a second notice of adverse action, this time arising out of the prison's finding that Freitag made false accusations regarding her fellow officer contaminating the inmate's food. As a result of the findings of the two IA investigations, Freitag was terminated shortly before the Office of the Inspector General issued its report. Freitag then initiated an administrative appeal of her termination before the California State Personnel Board. As far as the record before us reveals, the administrative appeal was still pending at the time the parties filed their briefs with this court.

## II

Freitag filed her initial complaint in the district court on June 27, 2000. She alleged that (1) the CDCR is liable under Title VII of the Civil Rights Act of 1964 for sexual harassment pursuant to a hostile work environment theory; (2) the CDCR is liable under Title VII for retaliation; (3) Ayers, Schwartz, Carmichael, Rodman, Dillard, O'Neill, George Neotti,[2] and Lopez are liable under 42 U.S.C. § 1983 for violating various of her constitutional rights; and (4) all of the defendants are liable under 42 U.S.C. § 1985 for conspiring to violate her constitutional rights. Freitag sought compensatory and punitive damages as well as injunctive relief.

On March 25, 2002, the district court granted in part and denied in part the defendants' motion for summary judgment. It denied the motion with respect to the following claims: (1) the Title VII hostile work environment claim against the CDCR, (2) the Title VII retaliation claim against the CDCR based upon adverse employment actions not including Freitag's termination, and (3) the § 1983 claim that the individual defendants retaliated against Freitag in violation of her First Amendment rights. A jury trial commenced in March 2003. Freitag and several of her fellow female correctional officers testified regarding the sexually abusive environment in the SHU and the lack of an adequate institutional response. Freitag's expert on prison administration, William Katsaris, testified that Pelican Bay was "the only institution I have come across that has a serious problem with [exhibitionist masturbation]." He stated that prisons throughout the country have controlled the problem in part by installing semi-opaque finish to control booth windows so that officers can see out but inmates cannot see in.[3] He further testified that Pelican Bay administrators could have taken, but failed to take, other corrective actions such as imposing serious disciplinary measures for sexual misconduct, restraining sexually abusive inmates or taking away their yard privileges, and working with the district attorney's office to prosecute serious and repeat offenders. In addition, the IG's report was admitted into evidence over the defendants' objection, and Ramsdell testified extensively regarding the agency's investigation into Freitag's complaints and the prison's failure to take the requisite corrective actions.

The jury returned a unanimous verdict on April 3, 2003. It found the CDCR

---

**2.** Neotti was Pelican Bay's employee relations officer.

**3.** Pelican Bay did install opaque material on SHU cell doors, which prevented officers from viewing celled inmates from the waist down, but it did not do so until late 2000 or early 2001, after Freitag was terminated. Further, it did not install the material on control booth windows and thus did not address the problem of inmates masturbating in the prison yard knowing that female correctional officers are on duty.

liable under Title VII for sexual harassment and retaliation, and Ayers, Schwartz, and Lopez liable under § 1983 for retaliation in violation of Freitag's First Amendment rights. It awarded Freitag $500,000 in economic damages and $100,000 in non-economic damages, and $100 in punitive damages against each Ayers, Schwartz, and Lopez. The verdict form did not require the jury to determine how much each defendant was liable for on each claim—it found the CDCR and Ayers, Schwartz, and Lopez jointly and severally liable for the entire amount of compensatory damages.

On May 15, 2003, Freitag moved to amend the judgment to include permanent injunctive relief. The district court granted her motion in part, finding that "this Court has the authority to fashion an injunction that benefits not only Plaintiff, but all female correctional officers and other staff members at Pelican Bay who have been or may be harmed by CDC's unlawful conduct." The court entered the following permanent injunction:

> The California Department of Corrections,[4] its agents, officers, successors in office, employees and all persons acting in concert or participating with the department are permanently enjoined from engaging in any employment practices, or taking any other personnel action, for the purpose or with the effect of maintaining a sexually hostile work environment at Pelican Bay State Prison, or otherwise discriminating against any Pelican Bay State Prison employee on the basis of sex. The California Department of Corrections, its agents, officers, successors in office, employees and all persons acting in concert or participating with the department are further

enjoined from engaging in any employment practices, or taking any other personnel action, for the purpose or with the effect of retaliating against any Pelican Bay State Prison employee for complaining about, or otherwise opposing, practices made unlawful by Title VII.

The district court denied Freitag's request that the court mandate specific measures to alleviate the problems she raised, opting instead to refer the matter to a special master with the authority to monitor compliance with the injunction and to develop a remedial plan. The court also awarded Freitag attorneys' fees.

The CDCR, Ayers, Schwartz, and Lopez appealed, raising the following arguments: (1) the CDCR cannot as a matter of law be liable under Title VII for a hostile work environment created by inmates and, even if it could be liable, substantial evidence does not support the jury's verdict of liability in this case; (2) substantial evidence does not support the jury's verdict that the CDCR is liable for retaliation under Title VII; (3) substantial evidence does not support the verdict against Ayers, Schwartz, and Lopez; (4) the award of compensatory and punitive damages is not supported by substantial evidence; and (5) the district court abused its discretion in granting injunctive relief.

### III

We review a district court's conclusions of law *de novo*. *See Tritchler v. County of Lake*, 358 F.3d 1150, 1154 (9th Cir.2004). A jury's verdict, including a damages award, must be upheld if supported by "substantial evidence." *See Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). The district court's grant of injunc-

---

**4.** At the time the district court granted injunctive relief, the agency was called the California Department of Corrections. In May 2005, it reorganized and changed its name to the California Department of Corrections and Rehabilitation.

tive relief is reviewed for an abuse of discretion and for the application of correct legal principles. *See Fortyune v. American Multi–Cinema, Inc.*, 364 F.3d 1075, 1079 (9th Cir.2004).

## IV

*Hostile Work Environment*

We first address the CDCR's contention that it cannot, as a matter of law, be liable under Title VII for maintaining a hostile work environment caused by inmate misconduct. The contention is unsupported by the entire weight of case authority in this circuit and others, and we are compelled to reject it.

■ In the Ninth Circuit, employers are liable for harassing conduct by non-employees "where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir.1997); *see also Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir.2002). In recognizing that employers may be liable for third-party conduct, we, along with several other circuits, *see, e.g., Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811–12 (7th Cir.2001); *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1244 (10th Cir.2001); *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1111 (8th Cir.1997), have relied in part upon a regulation of the Equal Employment Opportunity Commission that provides that employers may be held liable for the acts of non-employees where the employer "knows or should have known of the conduct and fails to take immediate and appropriate corrective action." 29 C.F.R. § 1604.11(e). This theory of liability is grounded not in the harassing act itself— i.e., inmate misconduct—but rather in the employer's "negligence and ratification" of

the harassment through its failure to take appropriate and reasonable responsive action. *See Galdamez v. Potter*, 415 F.3d 1015, 1022 (9th Cir.2005).

Notwithstanding the clarity of our law on this point, the defendants request that we become the first court in the country to carve out an exception to Title VII whereby prisons, due to their distinctive character and problems, and in particular their "inherently hostile environment," are immune from lawsuits by correctional officers arising from sexual harassment by inmates. In support of this position, the defendants cite several cases in which federal courts have treated prisons differently in the context of civil rights claims. For example, in *Slayton v. Ohio Department of Youth Services*, 206 F.3d 669, 677 (6th Cir.2000), in which a female correctional officer at a juvenile detention center alleged that the institution maintained a sexually hostile work environment caused in large part by inmate misconduct, the Sixth Circuit noted:

> Prisoners, by definition, have breached prevailing societal norms in fundamentally corrosive ways. By choosing to work in a prison, corrections personnel have acknowledged and accepted the probability they will face inappropriate and socially deviant behavior.

Nevertheless, the *Slayton* court upheld a jury verdict in favor of the plaintiff, ruling that, although allegations of inmate misconduct alone cannot support a hostile work environment claim, "this general rule against prison liability for inmate conduct does not apply when the institution fails to take appropriate steps to remedy or prevent illegal inmate behavior." *Id.*

The defendants also cite the following language from *Powell v. Morris*, 37 F.Supp.2d 1011, 1017 (S.D.Ohio 1999):

> The propensity of courts to decline imposing liability for prisoner acts is based

on solid logical and practical foundations: anyone who works at a prison ... must expect some off-color interactions. . . . It is absurd to expect that a prison can actually stop all obscene comments and conduct from its inmates—people who have been deemed unsuited to live in normal society.

However, the defendants neglect to cite the very next sentence of the *Powell* opinion: "The most we can expect and require prisons to do is to implement and enforce policies reasonably calculated to minimize such harassment and protect the safety of its employees." *Id.* The defendants also cited *Powell* in the district court but there too failed to include the abovementioned sentence, an act the district judge characterized as "illustrative of Defendants' tendency to mischaracterize the relevant case law." Notably, although the defendants cite *Powell* in support of their argument that "Title VII does not impose liability on a prison employer for a hostile work environment caused by inmates under a negligence theory of direct liability," they fail to refer to a passage in the opinion that is far more pertinent to the present case: "Courts have repeatedly declined to impose sexual harassment liability upon correctional institutions for the sexually offensive conduct of inmates, *as long as the defendant institution took proper preventative and remedial steps with regard to inmate behavior.*" *Id.* (emphasis added).

In short, the defendants cite no authority, and we have found none, holding that prisons are uniquely exempt from liability for sexual harassment under Title VII, nor have they proffered any evidence that Congress intended prison employers to be thus exempt. Further, we see no persuasive argument, legal or otherwise, to support the novel position that the defendants take on this issue. Nothing in the law suggests that prison officials may ignore sexually hostile conduct and refrain from taking corrective actions that would safeguard the rights of the victims, whether they be guards or inmates. As the district court found, "even in an inherently dangerous working environment, the focus remains on whether the employer took reasonable measures to make the workplace as safe as possible." The CDCR is not, by simple virtue of its status as a correctional institution, immune under Title VII from a legal obligation to take such measures and to protect its employees to the extent possible from inmate sexual abuse.

The next question is whether substantial evidence supports the jury's finding that the CDCR is liable for maintaining a hostile work environment in this case. A plaintiff asserting a Title VII claim under a hostile work environment theory must show (1) the existence of a hostile work environment to which the plaintiff was subjected, and (2) that the employer is liable for the harassment that caused the hostile environment to exist. *See Little*, 301 F.3d at 966 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–89, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). To establish the existence of a hostile work environment, "a plaintiff must prove that (1) she was subjected to verbal or physical conduct of a sexual nature, (2) this conduct was unwelcome, and (3) this conduct was sufficiently severe or pervasive to alter the conditions of ... employment and create an abusive working environment." *Id.* (internal quotations omitted). The third element requires us to consider the totality of the circumstances and whether the harassment was both objectively and subjectively abusive. *Id.* With respect to the question of liability for harassment caused by a third party, the employer's corrective measures must be "reasonably calculated to end the

harassment"; the reasonableness of the corrective action will depend on, *inter alia*, the employer's ability to stop the harassment and the promptness of the response. *See Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir.1991) (internal quotations omitted); *see also Galdamez*, 415 F.3d at 1024.

■ The jury found that Freitag was subjected to a hostile work environment due to inmate sexual misconduct, and that the CDCR was liable because it failed to take prompt and effective remedial action reasonably calculated to address the misconduct. We conclude with little difficulty that substantial evidence supports each finding. With respect to the finding that Freitag was subjected to a hostile employment environment: First, there is sufficient evidence that Freitag was repeatedly exposed to conduct of a sexual nature. The jury heard testimony and reviewed exhibits that established that Freitag witnessed inmates masturbating in an exhibitionist manner, oftentimes while they directed verbal taunts and crude remarks at her. Second, the defendants' argument to the contrary notwithstanding, there was substantial evidence that Freitag did not welcome the sexually abusive conduct merely by accepting a job in the SHU. Although it certainly would have been reasonable for Freitag to anticipate substantial inmate misbehavior, given the severity of the crimes committed by those incarcerated at Pelican Bay, *see Slayton*, 206 F.3d at 677, she also had reason to expect that prison officials would seek in good faith to control the most extreme forms of sexual misconduct. In any event, contemplating some difficulties is a far cry from *welcoming* a constant barrage of sexual abuse that, according to the testimony at trial, was allowed to continue virtually unfettered for the duration of Freitag's employment at the prison. Third, substantial evi-

dence supports the jury's finding that the exhibitionist masturbation was sufficiently severe or pervasive to constitute abuse. On this point, the defendants argue that, following Freitag's April 7, 1999 memorandum to Schwartz, which they characterize as her first complaint to prison administrators, she "witnessed only three incidents of inmate masturbation." Even accepting the defendants' argument that the CDCR did not know about such behavior until April 7, 1999, a single incident of severe abuse can constitute a hostile work environment. *See Little*, 301 F.3d at 967 (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)). More important, however, the defendants' time line misrepresents the record—it ignores Freitag's March 17, 1999 memorandum to O'Neill and Ayers in which she complained that her disciplinary reports on inmate sexual misconduct were being ignored. The defendants' tally thus does not account for the March 18 and April 7 incidents in which Freitag was exposed to exhibitionist masturbation. We find no basis to overturn the jury's determination on this issue.

■ The jury's second principal finding—that the CDCR failed to take prompt, corrective, and reasonable action to address the issue of inmate sexual misconduct—is also supported by substantial evidence. The jury heard testimony on this question from, among others, Katsaris, who testified that Pelican Bay is the only institution he has encountered with such a pervasive problem of inmate sexual misconduct. He testified regarding the corrective measures that other prisons have undertaken but that Pelican Bay had to that point ignored, including installing semi-opaque film on control towers and cells and imposing serious disciplinary measures on repeat offenders. The jury

also had before it the IG's report,[5] which enumerated the agency's findings that, among other things, the administrative staff at Pelican Bay had not responded appropriately to the concerns expressed by female officers about exhibitionist masturbation, and the institution had not taken adequate steps to correct the problem. The defendants' own brief acknowledges that "[t]he correctional staff controls inmates primarily by the inmate disciplinary process, physical restraints, revocation of privileges, and referral for criminal prosecution," all measures the evidence shows it failed to invoke sufficiently in this case.[6] Accordingly, there was more than enough evidence to support the jury's finding that the prison failed to respond adequately or reasonably to the sexual abuse directed at Freitag and other female correctional officers.

For these reasons, we affirm the jury's verdict that the CDCR may be, and is in this case, liable under Title VII for maintaining a hostile work environment at Pelican Bay.

5. The district court did not err in admitting the IG's report into evidence at trial. Under the hearsay exceptions for business records, FED. R. EVID. 803(6), and public records, *id.* 803(8), the report was afforded a presumption of reliability and trustworthiness that the defendants failed to rebut. *See Gilbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999). Specifically, Rule 803(8) allows the admission of reports of public agencies "setting forth ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." FED. R. EVID. 803(8); *see also Johnson v. City of Pleasanton*, 982 F.2d 350, 352 (9th Cir.1992) (holding that, under Rule 803(8), reports of public agencies shall be admitted where the challenging party fails to meet its burden to show untrustworthiness). The defendants had a fair opportunity to challenge the reliability of the report through their cross-examination of Ramsdell.

*Title VII Retaliation*

■■■■■ The defendants urge that substantial evidence does not support the jury's finding that the CDCR is liable under Title VII for retaliating against Freitag. A plaintiff may meet his burden of proof for a claim of retaliation under Title VII by showing, by a preponderance of the evidence, (1) involvement in protected activity opposing an unlawful employment practice, (2) an adverse employment action, and (3) a causal link between the protected activity and the adverse action. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). With respect to the first element, "opposition clause protection will be accorded whenever the opposition is based on a *reasonable belief* that the employer has engaged in an unlawful employment practice." *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir.1994) (internal quotes omitted) (emphasis in original).

The district court did not abuse its discretion in finding the report reliable.

6. The jury had before it evidence offered by the defendants regarding disciplinary measures taken, including a belated referral for criminal prosecution of a principal offender after Freitag had filed her formal complaint with the California Department of Fair Employment and Housing, and after she had sent two letters to State Senator Polanco that precipitated the investigation by the Inspector General. The belated referral, however, attempted to address the conduct of only one of the 20 inmates who were responsible for 56 incidents of exhibitionist masturbation in the security housing unit, as identified in the Inspector General's report. Moreover, the jury heard the Inspector General's findings that the "institution has stopped referring exhibitionist masturbation cases to the district attorney" and that "[c]ases that would be appropriate for prosecution are not referred."

The defendants make two related arguments as to CDCR retaliation. First, they contend that Freitag's belief that she opposed an unlawful employment action was unreasonable because "Title VII proscribes neither harassment by prison inmates nor a prison's failure to take adequate steps to address the harassment." That argument is foreclosed by our analysis in the previous section, which requires no repetition here. Second, the defendants argue that "[a]n employer cannot engage in unlawful retaliation if it does not know the employee has opposed or is opposing a violation of Title VII." To the extent that their contention is that they did not know Freitag was opposing unlawful sexual harassment, it is belied by (1) Freitag's April 7, 1999 memorandum to Schwartz, which stated that she should be "recompensed" for the injury she suffered due to the inmate misconduct she described and the prison's failure to respond; (2) her April 15, 1999, memorandum to Terhune, which alleged that the prison was doing nothing to address the "hostile worksite" created by inmate exhibitionist masturbation; and (3) her filing of a formal complaint with DFEH in August 1999 specifically alleging retaliation and harassment based upon her sex. To the extent that the defendants argue that they did not understand that the facts Freitag alleged regarding their failure to respond to the problems constituted a violation of Title VII, their argument is also without merit. The dispositive question is not whether the administrators at Pelican Bay believed that their failure to correct the complained of conditions constituted a violation of Title VII, but rather (1) whether they were aware that Freitag had "opposed" that failure and (2) whether Freitag's belief that their conduct was unlawful was reasonable. See Burdine, 450 U.S. at 252–53, 101 S.Ct. 1089. Notwithstanding the defendants' erroneous opinion of the law, they had the requisite knowledge regarding Freitag's complaints. As Freitag points out in her brief, "the inability of the defendants to grasp the mandate of Title VII, particularly in light of the clear language of 29 C.F.R. 1604.11, [ ] did not give them carte blanche to retaliate against [her] just because she evidently understood the law better than they did."

Because the defendants raise no meritorious challenge to the jury's finding that the CDCR is liable under Title VII for retaliating against Freitag, we affirm the verdict on this claim.[7]

*First Amendment Retaliation*

The jury found that Ayers, Schwartz, and Lopez retaliated against

---

7. On June 22, 2006, the defendants submitted a letter pursuant to Federal Rule of Appellate Procedure 28(j) in which they request that we consider the Supreme Court's recent decision in *Burlington Northern & Santa Fe Railway Co. v. White*, —— U.S. ——, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). They argue that *Burlington* rejected the Ninth Circuit's definition of what constitutes an adverse employment action and, accordingly, that we must reverse the Title VII retaliation verdict because the jury was not instructed that the employment actions must be considered adverse by a *reasonable* employee. *See Burlington*, 126 S.Ct. at 2415. We conclude that any instructional error was harmless. The instruction given to the jury stated that an adverse action "is defined as any action that is reasonably likely to deter the plaintiff or others from engaging in protected activity." The instruction, if erroneous, was harmless because the jury almost certainly would have found that the adverse employment actions it considered with respect to Freitag's Title VII claim—her temporary removal from duty in the SHU, the psychiatric evaluation, and the internal affairs investigations—would be considered materially adverse by a reasonable employee. *See Swinton v. Potomac Corp.*, 270 F.3d 794, 805 (9th Cir.2001) (holding that an instructional error in a civil case requires reversal only where the error is not "more probably than not harmless").

Freitag in violation of her First Amendment rights. On appeal, the defendants challenge the jury's finding with respect to each element required to establish a First Amendment claim against a public employer: (1) The employee engaged in constitutionally protected speech, (2) the employer took adverse employment action against the employee, and (3) the employee's speech was a "substantial or motivating" factor in the adverse action. *See Coszalter v. City of Salem,* 320 F.3d 968, 973 (9th Cir.2003). There can be no serious dispute that substantial evidence supports the jury's findings that the second and third elements were met with respect to Ayers and Schwartz.[8] Ayers initiated several IA investigations of Freitag shortly after she contacted Polanco, and Schwartz requested at least one IA investigation in the months after Freitag's complaints of sexual harassment. Both also approved her suspension and termination,[9] and there was sufficient evidence from which the jury could have inferred that Freitag's speech was a substantial or motivating factor in these adverse actions. *See Coszalter,* 320 F.3d at 977 (holding that a proximity in time of between three and eight months could support an inference of retaliation). However, because the Supreme Court's recent decision in *Garcetti v. Ceballos,* —— U.S. ——, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), modified prior First

Amendment jurisprudence with respect to the first element—employee protected speech—we remand Freitag's § 1983 claim to the district court for reconsideration in light of that decision.[10]

In *Ceballos,* the Supreme Court considered whether an internal memorandum written by a deputy district attorney to his supervisors regarding what he believed to be misconduct in an investigation was protected speech under the First Amendment. 126 S.Ct. at 1955–57. It concluded that, under *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the issue is not only whether the speech in question addresses a matter of public concern, but also whether it is made *as a citizen. See id.* at 1956 (citing *Connick,* 461 U.S. at 146–47, 103 S.Ct. 1684). The Court then determined that Ceballos did *not* speak as a citizen when he wrote the memorandum and thus did not engage in constitutionally protected speech, holding:

> The controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy. That consideration—the fact that Ceballos spoke as a prosecutor fulfilling his responsibility to advise his supervisor about how best to proceed with a pending case—distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline. We hold that when public em-

**8.** There is no evidence that Lopez is liable for retaliation under § 1983 because there is no evidence that he was responsible for, participated in, or even had knowledge of, any adverse employment action taken against Freitag. He did not contribute to the decision to relieve Freitag from her duty in the SHU, to refer her for psychiatric evaluation, to initiate the internal affairs investigations, or to terminate her. Thus, we reverse the jury verdict with respect to Lopez.

**9.** The defendants argue that the district court's grant of summary judgment to the CDCR on Freitag's termination claim under

Title VII necessarily barred consideration of her claim for termination under § 1983. That argument is foreclosed by our precedent. *See Allen v. Iranon,* 283 F.3d 1070, 1074 (9th Cir.2002) (rejecting the defendants' attempt to import a Title VII standard in a § 1983 case because "the Title VII[burden-shifting] formula ... allocates burdens of proof more favorably to defendants").

**10.** Subsequent to the issuance of *Ceballos,* we requested supplemental briefs from the parties addressing its effect on this case.

ployees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.

*Id.* at 1959–60 (internal citations omitted). Ceballos's First Amendment claim failed because, "[w]hen he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee" as opposed to a citizen for purposes of the First Amendment. *Id.* at 1960.

The Court in *Ceballos* relied in large part upon its ruling in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). It considered the case a "useful starting point" in its First Amendment analysis, and the speech at issue in *Pickering* a material contrast to that in the case before it. 126 S.Ct. at 1957. In *Pickering,* a school teacher wrote a letter to a local newspaper criticizing the school board's allocation of financial resources and the district superintendent's alleged attempt to prevent teachers from opposing a proposed school bond. 391 U.S. at 566, 88 S.Ct. 1731. The teacher was subsequently dismissed and he sued, claiming that the letter was protected by the First Amendment. *Id.* at 567, 88 S.Ct. 1731. The Supreme Court agreed, ruling that the teacher did not, by accepting his job, "relinquish the First Amendment rights [he] would otherwise enjoy as[a] citizen[ ] to comment on matters of public interest." *Id.* at 568, 88 S.Ct. 1731. In addition, the Court noted that teachers are

the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.

*Id.* at 572, 88 S.Ct. 1731.

We are confronted with two issues: (1) whether the jury was instructed to consider only speech that, in light of *Ceballos,* is protected under the First Amendment, and (2) whether, if the jury was permitted to consider speech that is not protected, the instruction was harmless. With respect to the first issue, the jury was instructed in pertinent part as follows:

Examples of speech protected by the First Amendment include:

(a) Reporting sexually hostile inmate conduct to agents of the California Department of Corrections, either formally or informally;

(b) Documenting Pelican Bay State Prison's responses or failures to respond to Plaintiff's reports of sexually hostile inmate conduct;

(c) Informing Cal Terhune, Director of the California Department of Corrections, of either the inmates' sexually hostile conduct or of Pelican Bay State Prison's responses or failures to respond;

(d) Informing State Senator Richard Polanco either of sexually hostile conduct or of the Pelican Bay State Prison's responses or failures to respond;

(e) Reporting either the sexually hostile conduct or Pelican Bay State Prison's responses or failures to respond to the Office of the Inspector General; or

(f) Cooperation with the investigation conducted by the Office of the Inspector General.

The defendants proffer two arguments why, in view of *Ceballos,* this instruction is erroneous and requires us to reverse the jury's verdict with respect to the § 1983 claim. First, they assert that Freitag did not in any instance speak "as a citizen" for

purposes of constitutional analysis. Second, they contend that Freitag's speech did not address a matter of public concern. We disagree with respect to items (d), (e), and (f)—Freitag's letters to Senator Polanco and her written and oral communications with the Inspector General—all of which is related to the sexual abuse that she and other female correctional officers suffered at Pelican Bay. We think it clear that these communications are protected under the First Amendment.

With respect to the defendants' first argument, *Pickering* and *Ceballos* require the conclusion that Freitag acted as a citizen when she wrote letters to Senator Polanco and communicated with the Inspector General regarding her complaints of sexual harassment. Her right to complain both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society regardless of his status as a public employee. *See Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. Indeed, these particular communications undoubtedly "bore similarities to letters submitted by numerous citizens every day." *Ceballos*, 126 S.Ct. at 1960 (citing *Pickering*). Under *Ceballos*, Freitag does not lose her right to speak as a citizen simply because she initiated the communications while at work or because they concerned the subject matter of her employment. *Id.* at 1959. The critical inquiry is instead whether Freitag engaged in the relevant speech "pursuant to [her] official duties." 126 S.Ct. at 1960. With respect to her contact with Senator Polanco and the IG, the answer is "No." [11]

It was certainly not part of her official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly, and specifically its failure to take corrective action to eliminate sexual harassment in its workplace. Rather, it was Freitag's responsibility *as a citizen* to expose such official malfeasance to broader scrutiny. Accordingly, in these instances, for purposes of the First Amendment she spoke as a citizen.

As to the defendants' second argument that Freitag's complaints did not address a matter of public concern, we strongly disagree. Her assertions that inmates at Pelican Bay engaged in sexually abusive behavior with respect to the female guards while the prison's administrators failed to take appropriate corrective measures is "relevan[t] to the public's evaluation of the performance of governmental agencies." *Coszalter*, 320 F.3d at 973–74. Notably, several female correctional officers, including Freitag, testified at trial that the hostile work environment at Pelican Bay made it very difficult for them to perform their duties, and Katsaris testified that, in such circumstances, the prison's authority over its inmates is significantly eroded. Further, although the proper administration of our prisons generally is undoubtedly of great public interest, the specific allegations in this case address a matter of acute concern to the entire community. A vast majority of our state's prisoners will reenter the general population some day, some sooner than others.[12] It certainly would be of grave concern if those inmates were being released into our neighbor-

---

11. We note that one IA investigation of Freitag arose from her purported improper use of state resources while on the job. That the defendants considered Freitag's use of copy machines and telephones to complain to outsiders about the harassment to which she was subjected improper and outside the scope of her employment is further evidence that her complaints were not made pursuant to her official duties.

12. The record is unclear as to whether any specific inmate who Freitag alleges contributed directly to the sexually hostile work environment has been released.

hoods from an environment in which the State of California condoned sexually abusive behavior and the harassment of women.

For these reasons, we hold that Freitag's communications with Senator Polanco and the California Inspector General constitute constitutionally protected speech. However, under the district court's instruction, those were not the only communications the jury was entitled to consider in determining whether Ayers and Schwartz retaliated against Freitag in violation of her First Amendment rights. The relevant jury instruction also listed, as examples of protected speech, Freitag's internal reports of inmate sexual misconduct and documentation of the prison's failure to respond, as well as her communications with Terhune, the director of the CDCR. To the extent that the jury may have considered internal forms prepared by Freitag, it is clear that, under *Ceballos,* such activity is *not* constitutionally protected. For purposes of First Amendment analysis, Freitag submitted those reports pursuant to her official duties as a correctional officer and thus not in her capacity as a citizen. Whether Freitag's April 15, 1999 letter to Terhune is protected under the First Amendment is a closer question. We are unsure whether prison guards are expected to air complaints regarding the conditions in their prisons all the way up to the Director of the CDCR at the state capitol in Sacramento. We are not aware, for example, what the union contract provides with respect to the persons to whom such grievances may or must be presented. The district court, having presided over this and related litigation for several years, may be in a better position to make the relevant factual determinations and, accordingly, we remand to it the issue of whether the Terhune letter is covered by the First Amendment.

Because the relevant instruction permitted the jury to consider, along with speech that we hold to be constitutionally protected, at least some unprotected speech as well, we remand Freitag's § 1983 claim to the district court for reconsideration. On remand, the district court shall make two determinations: (1) whether the Terhune letter constitutes protected speech, and (2) whether the jury instruction, which included as examples of protected speech either two or three items of unprotected speech, was more probably than not harmless. *See Swinton,* 270 F.3d at 805. In other words, is it more likely than not that the jury verdict was not affected by the erroneous inclusion of the two or three examples of unprotected speech? Given the district judge's expertise and his familiarity with the facts in the lengthy trial over which he presided, we think that he is best equipped to answer these questions in the first instance.

*Damages*

The defendants also challenge the jury's damages award, arguing that it is not supported by substantial evidence. The jury heard testimony from two expert witnesses regarding the economic damages that Freitag suffered as a result of the harassment and retaliation inflicted upon her by the CDCR and Pelican Bay prison administrators, as well as testimony from her treating psychiatrist regarding non-economic damages resulting from the same. The jury determined that, as a result of the harassment and the various retaliatory acts by the defendants, including the internal affairs investigations that eventually led to Freitag's termination, and the termination itself, she suffered $500,000 in economic damages. It also found that, as a result of the defendants' actions, she suffered $100,000 in non-economic damages.

The special verdict form did not require the jury to determine how much each defendant is liable for under each claim. Instead, the jury found all four appellants— the CDCR, Ayers, Schwartz, and Lopez (whom we have ordered dismissed)—jointly and severally liable for the entire $600,000 in compensatory damages. The defendants do not challenge on appeal the fact that the jury held them jointly and severally liable for the entire award. They argue only that the amount is not supported by substantial evidence.

Assuming that the jury's findings as to all of the various claims were to stand, we would have no difficulty holding that the total sum awarded was supported by substantial evidence. We are left in a difficult position *vis-à-vis* the damages award, however, because although we affirm the jury's verdict with respect to Freitag's Title VII claims, we are remanding her § 1983 claim. We do not wish to speculate whether the entire amount of compensatory damages would be justified if only Freitag's Title VII claims remained following the district court's reconsideration on remand, or what effect a modification of the verdict as to the § 1983 claim might have on the amount to be awarded. We prefer to leave that question to the district court for its initial review, if such review is necessary after it has addressed the harmless error question we have asked it to consider with respect to the § 1983 claim. Thus, we remand the jury's damages award with instructions to reconsider, if necessary, whether the $600,000 award of compensatory damages remains valid. *See Maynard v. City of San Jose*, 37 F.3d 1396, 1406 (9th Cir.1994). Because the award of $100 in punitive damages against each Ayers and Schwartz was in connection with the § 1983 claim, we remand that award for reconsideration, if necessary, as well. In addition, because the district court may wish to reconsider the extent to which Freitag remains a prevailing party after it determines what, if any, adjustments it must make with respect to liability and damages, we also remand the issue of attorneys' fees for reconsideration, if necessary.

*Injunctive Relief*

■■■ The defendants assert that the district court abused its discretion in granting permanent injunctive relief. The sole contention in support of their argument is that Freitag no longer works for the CDCR and thus cannot benefit from the injunction.

The defendants cite only *Rau v. Apple–Rio Management Company, Inc.*, 85 F.Supp.2d 1344 (N.D.Ga.1999), in which the district court granted a plaintiff limited injunctive relief following a favorable jury verdict on her Title VII claims. The court did not grant the plaintiff's request that her employer remove documents from her personnel file in part because she was no longer an employee, despite the fact that she opined that she could be reinstated if successful in a separate claim for constructive discharge. *Rau*, 85 F.Supp.2d at 1351 n. 4. The defendants urge that Freitag's re-employment with the CDCR is similarly "speculative," and thus that injunctive relief on her behalf is not appropriate.

Without endorsing the Georgia district court decision, we acknowledge that Freitag's reinstatement to employment with the CDCR is not certain. Nevertheless, when the district court issued its injunction, Freitag was still in the process of pursuing her state administrative appeal in which she maintains that she is entitled to retain her position as a correctional officer at Pelican Bay. Our decision in *Nanty v. Barrows Co.*, 660 F.2d 1327 (9th Cir.1981) (overruled on other grounds, *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756 (9th Cir.1996)), is pertinent. In

*Nanty,* we held that a Native American truck driver was unlawfully discriminated against under Title VII when a company failed to hire him because of his race. 660 F.2d at 1332. Although we remanded Nanty's request for an injunction requiring the company to hire him because the record was not clear whether it would have given him the job absent its discriminatory actions, we held that he nevertheless was entitled to an injunction prohibiting the company from discriminating on the basis of race in its future hiring. *Id.* at 1333. We affirmed the injunction in part because the question whether the plaintiff was entitled to the job he sought had not been finally resolved and, thus, he retained a personal interest in ensuring that the company's discriminatory activity be enjoined. *See id.*

■■■ In California, permanent state employees possess a property interest in their job, guaranteed by statute, with attendant due process rights in their continued employment. *See Skelly v. State Personnel Bd.,* 15 Cal.3d 194, 124 Cal.Rptr. 14, 539 P.2d 774, 784 (1975). That interest and the attendant rights are not lost upon termination but continue post-termination pending the final resolution of the administrative proceeding before the Personnel Board. *See id.* at 789; *see also* CAL. GOV'T CODE §§ 19575–78. The administrative process that will determine whether Freitag remains entitled to her job with the CDCR is pending, and thus her property interest and due process rights have not been extinguished. More important, at the time the district court issued the injunction, Freitag possessed a *property interest* in her job and thus possessed a sufficient connection to her employment with the prison to support the issuance of an injunction in her favor. We conclude, as did the district court, that she has

standing to seek an injunction affecting the employment practices of the CDCR.

## V

There was overwhelming evidence presented to the jury that the CDCR maintained a hostile work environment at Pelican Bay by failing to take prompt and reasonable corrective action with respect to Freitag's multiple complaints regarding inmate exhibitionist masturbation directed at her and other female correctional officers. There was also overwhelming evidence that agents of the CDCR retaliated against Freitag as a result of those complaints. For these reasons, we affirm the jury's verdict with respect to the CDCR's liability under Title VII. However, due to an intervening Supreme Court decision, we remand for reconsideration of the jury's finding that Freitag's superiors retaliated against her in violation of her First Amendment rights in light of the instructional error regarding constitutionally protected speech. In this connection, we direct the district court to determine whether such error was harmless. Accordingly, we remand the damages award and attorneys' fees award as well. Because of insufficiency of the evidence, we reverse the § 1983 judgment against Lopez. Finally, we affirm the district court's grant of injunctive relief.

**AFFIRMED IN PART, REVERSED IN PART, REMANDED IN PART.**